UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ILYA SEGAL, VADIM SEGAL, and DANCROFT
HOLDINGS,

       Plaintiffs,

   - against -

DMITRY FIRTASH and PUBLIC JOINT STOCK
COMPANY COMMERCIAL BANK NADRA,

       Defendants.

13 Civ. 7818 (RJS) (SN)

**AMENDED COMPLAINT**

   Plaintiffs Ilya Segal, Vadim Segal, and Dancroft Holdings, (collectively,
"Plaintiffs"), by their attorneys, Hodgson Russ LLP, as and for their amended complaint against
defendants Dmitry Firtash, and Public Joint Stock Company Commercial Bank Nadra
(collectively, "Defendants"), allege as follows:

### Nature of the Action

   1.  Ukrainian billionaire Dmitry Firtash — together with Nadra, the bank he,
upon information and belief, controls — engaged in a campaign of fraud, physical threats,
coercion, and corruption that resulted in the unlawful seizure of Plaintiffs' approximately $50
million interest in a Ukrainian soybean plant and Kakhovka Prom Agro ("Kakhovka").

   2.  Defendants' plan included luring Plaintiffs into a sham agreement that
purported to absolve Plaintiffs of a portion of their debt under loan agreements with Nadra.  In
reality, Defendants had no intention of honoring the agreement.

   3.  Defendants also tried and failed to intimidate Plaintiffs into outright
handing over 80 percent of Kakhovka to Firtash with no compensation.  When Plaintiffs refused,

Defendants leveraged corrupt court proceedings to defraud Plaintiffs out of assets worth far more than the original loans Defendants had extended. Though the proceedings were, upon information and belief, corrupt, Plaintiffs sought to comply with the court's rulings and pay the judgment in full. Defendants refused to accept payment because their objective was to seize control of Plaintiff's assets, the soybean plant and eventually gain total control of Kakhovka.

4.     With the help of enforcement officials under their control, Defendants seized the soybean plant and used Kakhovka for their sole benefit.

5.     Upon information and belief, Defendants prevented the Plaintiffs from regaining control of their property by initiating criminal proceedings against Kakhovka. Upon information and belief, Defendants also used their influence to provide false information to Interpol, which resulted in the issue of Red Notices that unjustly restricted the Segals' ability to travel and conduct business.

## The Parties

6.     Plaintiff Ilya Segal is a US citizen and New York resident.

7.     Plaintiff Vadim Segal is a US citizen and New York resident.

8.     Ilya Segal and Vadim Segal (together, the "Segals") own and/or control Dancroft Holdings Limited ("Dancroft"), a company registered and incorporated in Cyprus on January 29, 2004. Vadim Segal is authorized to act on Dancroft's behalf.

9.     On December 22, 2005, the Segals and Dancroft created Kakhovka, a limited liability company currently registered in the city of Donetsk, Ukraine.

- 2 -

10.     Upon information and belief, Defendant Dmitry Firtash ("Firtash") is a Ukrainian citizen, international businessman, and close ally of current Ukrainian president Viktor Yanukovych.

11.     Upon information and belief, Firtash was part of a political circle surrounding Yanukovych, which included the former Head of Administration of the President of Ukraine, Sergiy Lyovchkin, and the former Minister of Energy and Coal Industry, Yuriy Boyko.

12.     Firtash also has very close ties with Valeriy Khoroshkovsky ("Khoroshkovsky"), former Chairman of Ukrainian Security Service and former First Vice Prime Minister of Ukraine.  Upon information and belief, Khoroshkovsky and Firtash co-own Inter, one of the most influential television channels in the Ukraine.

13.     As a result of Firtash's intimate connections to the government, there is no fair and impartial forum for Plaintiffs' grievances in the Ukraine.

14.     Upon information and belief, Firtash exercises complete control over various companies, including CMZ Ventures LLC, the Dynamic Funds a/k/a/ The Dynamic Group, and Kallista Investments LLC a/k/a Calister Investments LLC, which share office space at 1501 Broadway, 25th floor, New York, New York 10036 (collectively, the "New York Companies.").  Upon information and belief, Firtash regularly directs investments and launders money through the New York Companies.

15.     Firtash also controls Group DF Limited (a/k/a Group of Dmitry Firtash), which, upon information and belief, transacts business regularly in the United States.

16.     Defendant Public Joint Stock Company Commercial Bank Nadra ("Nadra"), is a Ukrainian corporation established in Kyiv, Ukraine in 1993.  In September 2011, Nadra was the eighth largest bank in the Ukraine by volume of capital and assets.

17.     Upon information and belief, Nadra participates in, and derives profit from, international transactions, including investment activity by Firtash, and transfers funds to Firtash's holdings in the State of New York.

18.     Nadra earns revenue in the State of New York, including money related to shares of Mastercard stock and from transactions with New York citizens, including the Segals.

19.     Nadra pays taxes in the State of New York.

20.     Nadra maintains New York based accounts with JP Morgan Chase, Bank of New York Mellon, and Standard Chartered Bank.  Upon information and belief, together these accounts have a balance of at least approximately $400 million.

### Jurisdiction

21.     This Court may exercise personal jurisdiction over defendants pursuant to N.Y. CPLR §§ 301 and 302.

22.     Venue is proper because one of more of the plaintiffs reside in New York County.

## Facts

**Nadra and Kakhova**
**Enter into Financing Agreements**

22.     In 2006, the Segals and Dancroft caused Kakhova to commence construction of a very large soybean processing plant that would eventually capture almost 50 percent of the production of soybean product in the Ukraine (the "Plant").

23.     In connection with construction of the plant, Kakhovka sought financing from Nadra.  Kakhovka first entered into a loan agreement with Nadra on January 30, 2007. Kakhovka entered into additional credit agreements with Nadra on February 9, 2007 and March 5, 2008 (together, the "Loans").  Under the Loan Agreements, Nadra provided at least $19 million to Kakhovka.

24.     Between 2006 and 2009, Kakhovka required additional financing to make payments to equipment suppliers and entered into ten smaller credit agreements with Nadra (the "Letters of Credit").

25.     Ilya Segal negotiated the Loans on behalf of Kakhovka and Dancroft between 2006 and 2008.  Igor Gilenko ("Gilenko"), among others, acted on behalf of Nadra in these negotiations.

26.     As security for the Loans and Letters of Credit, Nadra accepted two types of security: 1) a pledge of Kakhovka's property and 2) a pledge of shares in Kakhovka that belonged to Dancroft.

**Firtash Takes Control of Nadra and**
**Devises a Fraudulent Scheme to Acquire Plaintiffs' Assets**

27.     Upon information and belief, Nadra began to struggle financially in 2008. Upon information and belief, Group DF expressed interest in acquiring 50 percent of Nadra in the autumn of 2008. Though no formal agreement was reached, upon information and belief, Firtash began to exert control over Nadra in 2008. This control was later formalized, upon information and belief, when Centragas Holding AG, a company affiliated with Group DF, acquired approximately 90 percent of the statutory capital of Nadra in 2011.

28.     Upon information and belief, Firtash's business partner, Khoroshkovsky, serving as the head of the Security Service of Ukraine, arranged for Valentyna Zhukovskaya ("Zhukovskaya") to be placed as Head of the Temporary Administration of Nadra. Upon information and belief, Firtash and Khoroshkovsky have very close business ties. Zhukovskaya confirmed that her work with Khoroshkovsky led to her appointment as Head of the Temporary Administration of Nadra.

29.     In the summer of 2009, Vadim Segal, acting on his own behalf and on behalf of Ilya Segal and Dancroft, met with Firtash, acting on his own and Nadra's behalf, to discuss possible modifications to loans Nadra had extended to companies associated with Plaintiffs.

30.     Once Vadim Segal, acting on his own behalf and on behalf of Ilya Segal and Dancroft, and Firtash, acting on his own behalf and on behalf of Nadra, had agreed on the basic outline of a deal, Firtash and Nadra's lawyer Mikhail Ilyashev ("Ilyashev") contacted Sergey Sukholinsky-Mestechkin ("Sukholinsky"), counsel for Plaintiffs' side. Sukholinsky and

Ilyashev spoke several times, with Ilyashev changing the terms of Firtash and Nadra's offer each time.

**Firtash and Nadra Entice**
**Plaintiffs Into A Fraudulent Agreement**

31.     On or about July 1, 2009, Firtash, his business partners, Ivan Fursin and Yuriy Borisov, his lawyer, Ilyashev, and his associate Khoroshkovsky's hand-picked temporary head of Nadra, Zhukovskaya, met with Sukholinsky and Vadim Segal in a conference room provided by Firtash at his offices.

32.     At the time of this meeting, all participants knew or should have known that the Segals were U.S. citizens and citizens of New York.

33.     At the time of the meeting, all participants were aware that Vadim Segal and Sukholinsky were acting on behalf of Vadim Segal, Ilya Segal, and Dancroft.

34.     At the meeting, Vadim Segal, acting on his own behalf and on behalf of Ilya Segal and Dancroft, entered into a handwritten agreement with Firtash, acting on his own behalf and on behalf of Nadra.  Vadim Segal and Firtash's initials appear on the handwritten agreement.  The agreement was signed by Fursin, on behalf of Firtash and Nadra, and Sukholinsky, on behalf of Plaintiffs.  (the "July 1, 2009 Agreement").  The July 1, 2009 Agreement is attached as Exhibit 1.  The written agreement captured a portion of the parties' agreements, but the parties also reached additional oral agreements.

35.     The July 1, 2009 Agreement, which temporary head of Nadra Zhukovskaya helped to negotiate, provided that Firtash would buy certain loans from Nadra.

The parties orally agreed that these loans would be two outstanding groups of loans for Kakhovka and the Freedom Farm group of companies. The July 1, 2009 Agreement provided that Plaintiffs would buy these loans from Firtash for 50 percent of their nominal value, minus five million.

36.     Firtash, on his own behalf and as a representative of Nadra, Nadra through its temporary head Zhukovskaya, and Vadim Segal, acting on his own behalf and on behalf of Ilya Segal and Dancroft, orally agreed that Plaintiffs would buy the right of demand for another two outstanding groups of loans (the "Nadra Purchase Loans") held by Nadra, for 50 percent of the loans' outstanding amounts.

37.     The right of demand under the Nadra Purchase Loans had almost no value. Plaintiffs would not have purchased the right of demand other than to effectuate the main deal regarding the two groups of loans pertaining to the Kakhovka and Freedom Farms group of companies. Thus, under the July 1, 2009 Agreement, Nadra was to receive compensation from two sources: 1) money for the two outstanding groups of loans from Kakhovka and the Freedom Farms companies; and 2) money from the direct sale of the Nadra Purchase Loans.

38.     During the July 1, 2009 meeting, Firtash and Ilyashev, acting on behalf of Firtash and Nadra, informed Vadim Segal and Sukholinsky, both of whom were acting on behalf of all Plaintiffs, that Nadra intended to file a lawsuit against Kakhovka and the Freedom Farm group of companies in the Commercial Court of the Kyiv Region claiming repayment of the loans. Ilyashev asserted that the suit would allow the Commercial Court of the Kyiv Region to bless the substance of the parties' agreement. According to Firtash and Ilyashev, Nadra needed

- 8 -

to file a lawsuit and then submit a settlement agreement containing the substance of the July 1, 2009 Agreement and the parties' oral agreements to the Court for approval.

39.     Vadim Segal and Sukholinsky, both of whom were acting on behalf of all Plaintiffs, objected to this plan. Under normal circumstances, disputes between Nadra and Kakhovka or Nadra and the Freedom Farm group of companies would be resolved in a venue other than the Commercial Court of the Kyiv Region. But Firtash had influence in the Kyiv Region and claimed that no other courts could move as quickly as was necessary. Ilyashev assured Sukholinsky and Vadim Segal that he had experience with such matters and that his proposal was absolutely legitimate. Ilyashev, on behalf of Firtash and Nadra, insisted that Sukholinsky and Vadim Segal, acting on behalf of all Plaintiffs, agree to allow such a suit to proceed.

40.     At the meeting on or about July 1, 2009 in the conference room provided by Firtash at his offices, Firtash, acting on his own behalf and on behalf of Nadra, Firtash's business partners Ivan Fursin and Yuriy Borisov, Firtash's lawyer Ilyashev, who acted on behalf of Firtash and Nadra, and Zhukovskaya, the temporary head of Nadra that, upon information and belief, Firtash and his business associates had hand-picked and who was acting on behalf of Nadra, falsely told Vadim Segal and Sukholinsky, both of whom were acting on behalf of all Plaintiffs, that signing the July 1, 2009 Agreement replaced the requirement to make payments under the Loans to Nadra.

41.     During the meeting, Firtash, Fursin, Borisov, Ilyashev and Zhukovskaya, acting on behalf of Firtash and Nadra, also falsely stated that all payments by Plaintiffs'

- 9 -

companies to Nadra were suspended, including Kakhovka's payments under the Loans and Letters of Credit. Firtash, Fursin, Borisov, Ilyashev and Zhukovskaya, acting on behalf of Firtash and Nadra, further falsely stated to Vadim Segal and Sukholinsky, both of whom were acting on behalf of all Plaintiffs, that the agreements between the parties reached in the July 1, 2009 meeting, partially memorialized in the July 1, 2009 Agreement and partially agreed to orally by all parties, would be consummated by settlement in a very short time and that suit would be brought only to allow this settlement to proceed.

42.     Firtash, Fursin, Borisov, Ilyashev and Zhukovskaya, acting on behalf of Firtash and Nadra, made these representations knowing they were false and with the intention that Plaintiffs would rely on the statements, thereby entering into the agreements with Defendants on July 1, 2009 and thereby ceasing to cause payments to be made on loans held by Nadra and acquiescing to the lawsuit desired by Defendants.

**Nadra and Firtash File Sham Lawsuits**
 **To Strip Plaintiffs of Assets**

43.     Unbeknownst to the Segals, Dancroft, Kakhovka or Freedom Farms, Ilyashev & Partners arranged for the involvement of a shell entity called "KVM," purported to be a Kyiv-based subsidiary of Nadra.

44.     At all relevant times, KVM was under Ilyashev & Partners' control. Upon information and belief, Roman Viktorovych Marchenko, a senior partner and co-owner of Ilyashev & Partners, was legally entitled to act on KVM's behalf.

45.     Upon information and belief, Ilyashev caused KVM to issue backdated guarantees of Kakhovka's and the Freedom Farm group's loans.

46.     Upon information and belief, KVM issued the guarantees in order to allow
Nadra to file suit in Kyiv Region. Under normal circumstances, disputes between Nadra and
Kakhovka and Nadra and the Freedom Farm group of companies would be resolved in a
different venue. By naming its Kyiv subsidiary, KVM, Nadra was able to file suit in the
Commercial Court of the Kyiv Region, where, upon information and belief, Nadra and Firtash
could leverage their contacts and influence to direct the outcome of the suits.

47.     In August of 2009, Nadra filed Case No 19/221-09 (the "August 2009
Suit") against Kakhovka, purportedly to recover more than $32 million dollars in principal debt
and penalties.

48.     Nadra also joined a claim to recover approximately $1,600 dollars from its
subsidiary, KVM, for breach of a purported June 3, 2009 agreement to guaranty Kakhovka's
performance under the Loans and 8 of the Letters of Credit (the "Guaranty Agreement").
Kakhovka has never seen a copy of the purported Guaranty Agreement, despite repeated
requests. Lawyers from Ilyashev & Partners represented both Nadra and KVM in the August
2009 Suit.

49.     Vadim Segal, acting on his own behalf and on behalf of Ilya Segal and
Dancroft, contacted Ilyashev and Borisov to ensure that the August 2009 Suit was proceeding
only to seal the agreement the parties had reached on July 1, 2009. Both Ilyashev and Borisov,
acting on behalf of Firtash and Nadra, falsely stated on several occasions to Vadim Segal, who
they knew to be acting on behalf of all Plaintiffs, that the suit was instituted only to effect the

- 11 -

parties' agreement. Borisov and Ilyashev, acting on behalf of Firtash and Nadra, knew these representations to be false when made and intended for Plaintiffs to rely on their false statements.

50.     In or about August and September of 2009, Sukholinsky, acting on behalf of Plaintiffs, met with Fursin and Ilyashev, acting on behalf of Defendants, at Fursin's bank office and in Ilyashev's office on several occasions to discuss the August 2009 Suit. Fursin and Ilyashev, acting on behalf of Defendants, falsely stated to Sukholinsky, acting on behalf of Plaintiffs, that the suit was proceeding as expected, and would ensure that the agreement between the parties was consummated.

51.     Fursin and Ilyashev, acting on behalf of Defendants, further falsely stated to Sukholinsky, acting on behalf of Plaintiffs, that Defendants were following the settlement plan as per the parties' agreement. Ilyashev and Fursin, acting on behalf of Defendants, knew these statements were false when they were made and intended for Plaintiffs to rely on their false statements.

## Nadra and Firtash Renege on Their Agreements

52.     Zhukovskaya, Head of the Temporary Administration of Nadra, had upon information and belief been placed in her position by her former employer Khoroshkovsky in collusion with his business partner Firtash. Zhukovskaya stated that Firtash exerted influence over Zhukovskaya.

53.     In the autumn of 2009, Zhukovskaya, acting on behalf of Nadra, called Vadim Segal and personally invited him to come to her office. When Vadim Segal, acting on behalf of all Plaintiffs, arrived, Zhukovskaya informed Plaintiffs for the first time that she would

not allow the settlement needed to consummate the agreement that Plaintiffs had made with Nadra and Firtash on July 1, 2009, although she had been present for the negotiation of the agreement.

54.    Zhukovskaya, on behalf of Nadra, also said that unless Plaintiffs arranged for an immediate full payment of all outstanding loans to Nadra, Khoroshkovsky would damage Plaintiffs through legal actions in Ukraine and in the United States. Zhokovskaya stated that Firtash told Khoroshkovsky to direct Zhokovskaya to make this threat.

55.    When Vadim Segal, acting on behalf of Plaintiffs, refused, Zhukovskaya, acting on behalf of Nadra, suggested that he restructure Kakhovka's outstanding loans with an effective annual interest rate of over 20 percent.

56.    Vadim Segal rejected these terms on behalf of Plaintiffs and left the meeting.

57.    Over the next few months, Vadim Segal repeatedly tried to contact Firtash through Borisov. Borisov was one of Firtash's top managers, handling Firtash's affairs in Austria and Ukraine. He never put Vadim Segal in touch with Firtash. Neither Borisov nor Firtash provided Segal with any explanation of the sudden failure of the parties' agreement.

58.    In the spring of 2010, Vadim Segal, acting on behalf of all Plaintiffs, met with Firtash at Firtash's office. During the meeting, Firtash, acting on his own behalf and on behalf of Nadra, told Vadim Segal, acting on behalf of Plaintiffs, that Firtash and Nadra were reneging on the agreement made by the parties on July 1, 2009 and that Plaintiffs owed Firtash at least $100 million for purported damage to Nadra.

59.     In order to justify Nadra and Firtash reneging on the prior agreement, Firtash accused Plaintiffs of working with Igor Gilenko, former CEO of Nadra, to cause damage to Nadra.

60.     Firtash again demanded that Plaintiffs agree to the harsh terms previously proposed by Zhukovskaya, requiring that Plaintiffs pay all loans outstanding to Nadra in full immediately or accept a restructuring of the debt with an effective interest rate of more than 20 percent. Vadim Segal, on behalf of Plaintiffs, refused to agree to such terms and left.

61.     At their next meeting, Firtash again threatened Vadim Segal. Firtash, acting on his own behalf and on behalf of Nadra, added to his prior demands, insisting that Plaintiffs turn over 80 percent of Kakhovka's shares to Firtash for free. Firtash said that Plaintiffs could pay off outstanding debts to Nadra with no punishment and keep 20 percent of Kakhovka's equity if Plaintiffs agreed to the "offer." Vadim Segal, acting on behalf of Plaintiffs, rejected the "offer."

62.     Firtash and Nadra thereafter used the August 2009 Suit, which they had assured Plaintiffs was filed only to effect the agreement made by the parties on July 1, 2009, to take Kakhovka's property. Kakhovka tried to protect its interests in court. On September 22, 2009, Kakhovka filed a counterclaim challenging the Guaranty Agreement's validity.

63.     On April 8, 2010, Judge Karpechkin ruled on the merits of the August 2009 Suit although only a representative from Nadra was present at the hearing. The ruling partially satisfied Nadra's demands, awarding more than $32 million, and denied Kakhovka's counterclaims in their entirety. Kakhovka appealed on April 14, 2010. The Kyiv Appellate

Commercial Court denied the appeal on October 19, 2010.  Both lower court decisions were

further challenged by Kakhovka with the Supreme Commercial Court of Ukraine.  The Supreme

Commercial Court of Ukraine rejected the claim of Kakhovka and upheld both lower court

decisions on March 16, 2011.

**Defendants Thwart Kakhovka's Attempts to**
**Satisfy the Judgment In Order to Seize the Plant**

64.     As the judgment in the August 2009 Suit entered into its legal force on the

date when the Kyiv Appellate Court ruled on the case, Kakhovka immediately took action to

fully satisfy the approximately $32 million judgment against it in the August 2009 Suit.

However, Nadra thwarted Kakhovka's efforts at every turn.  Upon information and belief, Nadra

did so in order to create a pretext for seizing the Plant and eventually seizing of Kakhovka's

remaining assets.

65.     After its loss before Judge Karpechkin, Kakhovka took steps to satisfy the

large judgment against it.  It was obliged to sell part of its assets, including real estate, and to

take out loans from a Cyprus company to satisfy the illegitimate judgment.

66.     The Commercial Court of the Kyiv Region issued an enforcement order

on October 26, 2010 (the "October 2010 Enforcement Order").

67.     Kakhovka immediately tried to contact Nadra in an attempt to pay the full

amount required by the October 2010 Enforcement Order.  Kakhovka sent official letters on or

about November 9, 2010 and November 12, 2010, and a notarized letter, on or about November

19, 2010 from Kakhovka's Deputy Director General O.P. Pitsyk to Nadra, seeking disclosure of

its account details.

68.     Nadra refused and/or ignored requests to provide bank account information so that Kakhovka could provide Nadra with the funds. Instead, on November 26, 2010, Nadra applied to the Department of State Enforcement Services for enforcement of the October 2010 Enforcement Order.

69.     On November 30, 2010, a senior enforcement official issued a resolution commencing enforcement proceedings against Kakhovka. On December 3, 2010 – just three days before the deadline for its compliance - Kakhovka received the resolution notifying it that it was obliged to comply with the October 2010 Enforcement Order by December 6, 2010 or its property could be seized.

70.     Neither state enforcement officials nor the court order provided Kakhovka with Nadra's bank account information in order to allow Kakhovka to transfer money to Nadra's account. Kakhovka attempted to locate Nadra's account details, but was unable to do so. On December 6, 2010, Kakhovka applied to the Head of the Enforcement Decisions Department requesting details of Nadra's bank account in order to perform under the Court Order, an extraordinary step not usually required of debtors seeking to perform judgments in the Ukraine.

71.     In an attempt to comply with the judgment, Kakhovka transferred the entire sum required by the October 2010 Enforcement Order to an account owned by the Enforcement Service on the December 6, 2011 deadline.

72.     Two days after the deadline had passed, Nadra sent a letter with an outdated account number to the Enforcement Service. Upon information and belief, the

- 16 -

Enforcement Service knew or should have known that this account number was no longer valid, but attempted to transfer the money anyway.

73.     On December 14, 2010, the Ministry of Justice requested that Nadra provide appropriate bank details by December 17, 2010.  Nadra allegedly sent a letter on December 15, 2010 providing these details, but the Ministry of Justice either missed or ignored Nadra's letter.

74.     On December 30, 2010, the Ministry returned Kakhovka's payment in satisfaction of the October 2010 Enforcement Order, despite Kakhovka's repeated petitions to close the enforcement file because Kakhovka had surrendered the full amount due to the Enforcement Service.

**Nadra Brings Further Improper Court**
**Proceedings In Order to Wrongfully Seize the Plant**

75.     While failing to provide details allowing Kakhovka to remit its payment under the August 2009 Suit, Nadra returned to court to seek further relief.  On December 10, 2010, Nadra filed Case No. 10/265-10 in the Commercial Court of Kyiv Region (the "December 2010 Suit") which included: 1) a claim requesting in excess of $11 million in purported further damages and penalties arising from alleged breaches of the Loans and Service Agreements arising after commencement of the August 2009 Suit until November 28, 2010, and 2) a motion requesting immediate turnover of Kakhovka's Plant to safeguard its interests.

76.     Nadra also claimed damages of approximately $250 from KVM as Kakhovka's guarantor, a transparent bid to keep the case in the Kyiv Region courts.

77.     On December 13, 2010, Judge Pryvalov Artem Igorovych, who presided over the December 2010 Suit, issued an order that imposed the arrest on Kakhovka's immovable property and transferred custody of all immovable property, including the Plant, to Nadra (the "Plant Seizure Order").

78.     On December 21, 2010, the Senior Enforcement Officer of the Department of the State Enforcement Service of the Novokakhovskiy City Department of Justice issued a resolution authorizing the dispatch of ten policemen to facilitate enforcement of the Plant Seizure Order.  Kakhovka appealed the Plant Seizure Order to both the Kyiv Appellate Commercial Court and the Supreme Commercial Court of Ukraine, but its appeals were summarily rejected.

**Defendants Seize the Plant by Force**

79.     Upon information and belief, on or about December 22, 2010, an armed group of approximately 100, consisting of Nadra's security services and representatives of the Enforcement Service, seized control of the Plant.

80.     In addition to taking control of the Plant, this group also took control of property and raw materials, some of which belonged to legal entities other than Kakhovka that are owned and/or controlled by the Segals.

81.     This seizure created obstacles to normal operation of the Plant.  The group prevented products and raw materials from being transported from the Plant, and upon information and belief paralyzed the Plant's operations and prevented employees from accessing their workplaces.

**The Plant Seizure Order is Revealed as a Sham**

82.     On January 20, 2011, Nadra re-filed for enforcement of the October 2010 Enforcement Order of the August 2009 Suit. The next day, the Enforcement Service issued a resolution impounding all of Kakhovka's property in satisfaction of the judgment in the August 2009 Suit. That same day, pursuant to a motion by Kakhovka, the Commercial Court of Kyiv cancelled the portions of the Plant Seizure Order granting Nadra custody over Kakhovka's immovable property, including the Plant.

83.     On January 18, 2011, Kakhovka filed a counterclaim in the December 2010 Suit alleging that it was not liable for any penalties because it had tendered the full amount due under the judgment in the August 2009 Suit to Nadra which satisfied in full all debts under the Loan Agreements and Letters of Credit.

84.     On January 27, 2011, the Commercial Court of Kiev issued an order partially granting the damages relief that Nadra requested in the December 2010 Suit. The decision did not even mention Kakhovka's counterclaim.

85.     Upon information and belief, Nadra never sought to enforce the January 27, 2011 order, having already seized Kakhovka's Plant.

86.     Meanwhile, Nadra continued to refuse to accept Kakhovka's full payment of August 2009 Suit judgment. On February 2, 2011 Kakhovka sent a letter informing Nadra of the existence of a bank account holding the amount of the judgment and demanding that Nadra debit that account. That same day, Kakhovka also demanded that Nadra close its current account at Nadra and transfer funds from that account in satisfaction of the judgment. Kakhovka sent

another payment order and demanded that Nadra withdraw funds waiting for it in an account on February 18, 2011.

      87.     Nadra failed to accept any of the payments tendered by Kakhovka.

**Nadra and Firtash Squander Kakhovka's Assets**

      88.     On February 4, 2011, the Commercial Court of Donetsk commenced bankruptcy proceedings as Case No 27/25B (the "Bankruptcy").

      89.     Upon information and belief, Firtash, Nadra, and Ilyashev conspired to take over Kakhovka's remaining operations through the Bankruptcy.

      90.     In February 0f 2011, the Commercial Court of Donetsk appointed an impartial bankruptcy administrator.

      91.     Upon information and belief, on July 5, 2011,  Nadra arranged to have the impartial bankruptcy administrator replaced with Vadym Andriyovych Kizlenko ("Kizlenko"), an employee at Ilyashev & Partners.  Ilyashev & Partners represented Nadra's interests in both the August 2009 and Second Suits, and has longstanding ties to Firtash.  In fact, Kizlenko himself represented KVM in both the August 2009 Suit and the December 2010 Suit.

      92.     True to form, Kizlenko has, upon information and belief, run Kakhovka's affairs strictly for the benefit of Firtash.

      93.     During his administration, large portions of Kakhovka's assets have been sold for below-market prices.  An appraiser hired by the Enforcement Service made a valuation of portions of Kakhovka's property, including part of the Plant, on June 3, 2011.  This valuation

assessed the property below fair market value.  The Enforcement Service then further decreased

the price of Kakhovka's asserts on August 26, 2011, to just over $1 million – well below fair

market value of the property.  The property was sold at auction on September 28, 2011 for well

below fair market value to a company called Limited Liability Company Asset Management

Company Industrial Investments ("LLCAMCII").  Upon information and belief, LLCAMCII has

close ties to Firtash.

94.     Shortly thereafter, on October 25, 2011, the Commercial Court of the Kyiv

Region canceled the remainder of the Plant Seizure Order.

95.     On December 13, 2011, as part of the Bankruptcy, the Commercial Court

of the Donetsk Region appointed Kizlenko acting director of Kakhovka.  The former director

was removed by the same ruling.  Upon information and belief, the former director appealed, but

his appeal was summarily rejected.

**Firtash Orchestrates Criminal**
**Proceedings Against Kakhovka**

96.     In addition to appropriation of Plaintiffs' assets, upon information and

belief Firtash supported criminal proceedings against Kakhovka and its directors, officers, and

employees for the purpose of increasing pressure on Plaintiffs.

97.     Upon information and belief, the Head of the Main Investigation

Department of the Ministry of Internal Affairs of Ukraine, Vasyl Ivanovych Farinnick

("Farinnick"), pursued criminal proceedings against Kakhovka beginning on March 29, 2011.

98.     Upon information and belief, Firtash is a close associate of Farinnick's. The proceedings also involved the Ukrainian Security Service – led by Khoroshkovsky, who upon information and belief is another close associate of Firtash's.  Upon information and belief, Firtash used his influence to cause the criminal proceedings to occur.

99.     The proceedings were not filed against any particular person, and were brought pursuant to an accusation by the Director of the Bank Security Department of Nadra that Kakhovka allegedly signed the Loan Agreements with no intention to repay.

100.    Upon information and belief, Firtash would have had to authorize such an action.

101.    Nadra alleged that these actions caused nearly $20 million in damages.

102.    On March 31, 2011, the Pecherskiy District Court gave force to the Senior Investigator's motion to seize Kakhovka's assets in its account with Nadra as a preventative measure in this case.

**Firtash Orchestrates Criminal**
**Proceedings To Persecute the Segals**

103.    In addition, upon information and belief, Firtash used his influence to initiate criminal proceedings against the Segals on false pretenses.

104.    Upon information and belief, on June 8, 2011 the official website of Interpol announced official international retrieval of the Segals, known as "Red Notices."  The U.S. Department of Justice describes Red Notices as "the closest instrument to an international arrest warrant in use today."

105.    Upon information and belief, the notices were allegedly issued pursuant to a June 7, 2011 resolution of the Shevchenkivskiy District Court of Kyiv (the "June 7 Order") that authorized restraint via detention of both of the Segals.

106.    Upon information and belief, the Appellate Court of Kyiv refused to consider the Segals' appeal due to the absence of any documents from the Shevchenkivskiy District Court of Kyiv regarding the detention of the Segals – meaning the district court had never considered the alleged case against the Segals or issued the June 7 Order referenced by Interpol. Upon information and belief, Interpol removed reference to the order after July 20, 2011.

107.    The Segals again appealed the alleged order for their detention, this time indicating that the appeals court should look for a resolution from the Shevchenkivskiy District Court of Kyiv issued between March 22, 2011 and June 7, 2011. On September 29, 2011, the Appellate Court of Kyiv again refused to consider the appeal because no such resolution existed.

108.    Finally, the Segals clarified that the Red Notices were likely issued in conjunction with the criminal investigation of Igor Gilenko, who was President and Head of the Board of Nadra from 1997 and 2009. Upon information and belief, the Shevchenkivskiy District Court of Kyiv issued an order restraining the Segals in order to ensure their appearance in court.

109.    Firtash had falsely accused the Segals of colluding with Gilenko in the buildup to the August 2009 Suit. Upon information and belief, Firtash caused the Red Notices to be issued.

- 23 -

110.    The Red Notices prevent the Segals from traveling not only within Ukraine but in any country party to the European Convention on Extradition of Criminals of 1957.  Active Red Notices also subject the Segals to possible extradition to Ukraine from other nations.

### FIRST CAUSE OF ACTION
**(Breach of Contract against all Defendants by all Plaintiffs)**

111.    Plaintiffs repeat the allegations in paragraphs 1 through 110 as if fully set forth here.

112.    On or about July 1, 2009, Nadra and Firtash entered into an agreement with Vadim Segal, Ilya Segal, and Dancroft.  The agreement was reached by, on the one hand, Vadim Segal, acting on his own behalf and on behalf of Ilya Segal and Dancroft, and Sergey Sukholinsky-Mestechkin, acting on behalf of Plaintiffs; and on the other hand Firtash, as an individual and as a representative of Nadra, Firtash's business associates Yuriy Borisov and Ivan Fursin, Firtash's and Nadra's lawyer Mikhail Ilyashev and temporary head of Nadra Valentyna Zhukovskaya, acting on behalf of Nadra.  A copy of the writing memorializing a portion of the parties' agreement is annexed as **Exhibit 1**.

113.    Defendants and Plaintiffs both understood that the parties' agreement included separate oral agreements, as well as the written agreement.  Defendants understood that all Plaintiffs were intended beneficiaries of the agreement.

114.    Under the agreement, Firtash and Nadra would sell two outstanding groups of loans for Kakhovka and the Freedom Farm group of companies to Plaintiffs for 50 percent of their nominal value, minus five million.  In return, Plaintiffs agreed to buy the right of

demand for another two outstanding groups of loans held by Nadra for 50 percent of the loans' outstanding amounts.

115. Additionally, the parties agreed that the agreement reached on July 1, 2009 agreement fixed the amounts to be repaid to Nadra and for this reason Plaintiffs did not need to make additional payments on loans owed to Nadra, including payments under the Loans and Letters of Credit. The parties agreed to consummate the agreement by settlement and that Defendants would bring a lawsuit that would facilitate the settlement.

116. Nadra and Firtash willfully breached the agreement by, among other things, demanding full repayment of Plaintiffs' debts, breaching the implied covenant of good faith and fair dealing, and deliberately frustrating and hindering the condition precedent of the agreement requiring it to be consummated by settlement, thereby deliberately preventing Plaintiffs from enjoying the fruits of the contract.

117. The Plaintiffs have sustained damages as a result of Nadra's breach in an amount to be proved at trial.

## SECOND CAUSE OF ACTION
### (Fraud against all Defendants by all Plaintiffs)

118. Plaintiffs repeat the allegations in paragraphs 1 to 117 as if fully set forth here.

119. On or about July 1, 2009, Firtash, on his own behalf and as a representative of Nadra, Firtash's business associates Yuriy Borisov and Ivan Fursin, Firtash's and Nadra's lawyer Mikhail Ilyashev and temporary head of Nadra Valentyna Zhukovskaya,

acting on behalf of Nadra, met with Vadim Segal and Segal's lawyer Sergey Sukholinsky-Mestechkin. All parties present at the meeting were aware that Vadim Segal and Sergey Sukholinksy-Metechkin were acting on behalf of all Plaintiffs.

120.    The meeting was held in a conference room provided by Firtash at Firtash's offices. At this meeting, Firtash, Borisov, Fursin, Ilyashev and Zhukovskaya falsely represented to the Vadim Segal and Sergey Sukholinksy-Metechkin, both of whom were acting on behalf of all Plaintiffs, that if the Plaintiffs would purchase two outstanding groups of loans held by Nadra, for 50 percent of the loans' outstanding amounts, Firtash and Nadra would sell two groups of loans taken out by Kakhovka and the Freedom Farms group of companies back to the Plaintiffs for 50 percent of their nominal value, minus five million. Firtash, Fursin, Borisov, Ilyashev and Zhukovskaya, acting on behalf of Firtash and Nadra, also falsely stated to the Vadim Segal and Sergey Sukholinksy-Metechkin, both of whom were acting on behalf of all Plaintiffs, that all payments by companies associated with Plaintiffs to Nadra were suspended because of Plaintiffs' agreement to buy the loans.

121.    Firtash, Fursin, Borisov, Ilyashev and Zhukovskaya, acting on behalf of Firtash and Nadra, made these representations knowing they were false, and intending for Plaintiffs to rely on the false statements, thereby entering an agreement with Defendants and ceasing to make payment on loans to Nadra.

122.    At the same meeting on or about July 1, 2009, Firtash, Borisov, Fursin, Ilyashev and Zhukovskaya, acting on behalf of Firtash and Nadra, falsely stated to the Vadim Segal and Sergey Sukholinksy-Metechkin, both of whom were acting on behalf of all Plaintiffs,

- 26 -

that the July 1, 2009 agreement replaced all obligations to Nadra under the Loans and Letters of Credit. Firtash, Fursin, Borisov, Ilyashev and Zhukovskaya, acting on behalf of Firtash and Nadra, further falsely stated to Vadim Segal and Sergey Sukholinksy-Metechkin, both of whom were acting on behalf of all Plaintiffs, that the agreements between the parties reached in the July 1, 2009 meeting, partially memorialized in the July 1, 2009 Agreement and partially agreed to orally by all parties, would be consummated by settlement in a very short time and that suit would be brought only to allow this settlement to proceed.

123.    Firtash, Fursin, Borisov, Ilyashev and Zhukovskaya, acting on behalf of Firtash and Nadra, made these representations knowing they were false and intending for Plaintiffs to rely on the false statements, thereby entering into an agreement with Defendants, ceasing to make payment on loans to Nadra, and acquiescing to the lawsuit brought by Nadra.

124.    In August of 2009, Vadim Segal, acting on his own behalf and on behalf of Ilya Segal and Dancroft, contacted Ilyashev and Borisov to ensure that the August 2009 Suit was proceeding only to seal the parties' agreement as reached on July 1, 2009. Both Ilyashev and Borisov, acting on behalf of Firtash and Nadra, falsely stated on several occasions to Vadim Segal, who they knew to be acting on behalf of all Plaintiffs, that the suit was instituted only to effect the parties' agreement.

125.    Borisov and Ilyashev, acting on behalf of Firtash and Nadra, knew these representations to be false when made. Borisov and Ilyashev, acting on behalf of Firtash and Nadra, intended Plaintiffs to rely on their false statements to allow the lawsuit to proceed and to cause Plaintiffs to continue not to cause payments to be made on loans to Nadra.

- 27 -

126.    In or about August and September of 2009, Sergey Sukholinksy-Metechkin, acting on behalf of Plaintiffs, met with Fursin and Ilyashev, acting on behalf of Defendants, at Fursin's bank office and in Ilyashev's office on several occasions to discuss the August 2009 Suit.  Fursin and Ilyashev, acting on behalf of Defendants, falsely stated to Sukholinsky, acting on behalf of Plaintiffs, that the suit was proceeding as expected, and was a legitimate way to make sure the agreement between the parties was consummated.

127.    Fursin and Ilyashev, acting on behalf of Defendants, further falsely stated to Sukholinsky, acting on behalf of Plaintiffs, that Defendants were following the settlement plan as per the Agreement.  Ilyashev and Fursin, acting on behalf of Defendants, knew these statements were false when they were made.  Ilyashev and Fursin, acting on behalf of Firtash and Nadra, intended Plaintiffs to rely on their false statements to allow the lawsuit to proceed and to cause Plaintiffs to continue not to cause payments to be made on loans to Nadra.

128.    As a result of the fraudulent scheme, Firtash and Nadra damaged Plaintiffs by illegally acquiring Kakhovka, and destroying the value of Plaintiffs' assets.

129.    Plaintiffs have suffered great financial damage, in an amount to be proved at trial, including but not limited to, the loss of Kakhovka, the soybean plant, and related assets.

## THIRD CAUSE OF ACTION
### (Injurious Falsehood against Firtash by Ilya and Vadim Segal)

130.    Plaintiffs Ilya and Vadim Segal repeat the allegations of paragraphs 1 to 129 as if fully set forth here.

131.    On or about June 7, 2011, Firtash, thorough his contacts in the Ukrainian government, informed Interpol that a detention order for the Segals had been issued by Shevchenkivskiy District court of Kyiv on June 7, 2011.

132.    Firtash knew these statements to be false.  In fact, the Kyiv Court of Appeals has since found that no such detention order exists.

133.    Firtash intended to cause Interpol to place Red Notices on the Segals.  In reliance on Firtash's false statements, Interpol issued Red Notices on or about June 8, 2011.

134.    As a result, the Segals' travel has been restricted, causing them to incur significant expenses.  Ilya and Vadim Segal have suffered damage as a result in an amount to be proved at trial.

## FOURTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress against Firtash by Ilya and Vadim Segal)

135.    Plaintiffs Ilya and Vadim Segal repeat the allegations of paragraphs 1 to 134 as if fully set forth here.

136.    On or about June 7, 2011, Firtash, thorough his contacts in the Ukrainian government, informed Interpol that a detention order for the Segals had been issued by Shevchenkivskiy District court of Kyiv on June 7, 2011.

137.    Firtash knew these statements to be false.

138.    Firtash intended to cause Interpol to place Red Notices on the Segals.  In reliance on Firtash's false statements, Interpol issued Red Notices on or about June 8, 2011.

139.     As a result of this extreme and outrageous conduct, the Segals' travel has been restricted, their reputations have been damaged, and their liberty has been placed constantly in jeopardy under false pretenses.

140.     Ilya and Vadim Segal have suffered damage as a result in an amount to be proved at trial.

## FIFTH CAUSE OF ACTION
### (Conspiracy to Commit Fraud against all Defendants by all Plaintiffs)

141.     Plaintiffs repeat the allegations of paragraphs 1 to 140 as if fully set forth here.

142.     As set forth in detail herein, Firtash and Nadra entered into an agreement, pursuant to which they would and did engage in a scheme to defraud Plaintiffs of assets and divert those assets for their own use.

143.     Upon information and belief Nadra agreed to and participated in overt acts to assist Firtash in carrying out his scheme to defraud Plaintiffs, enriching Firtash and itself at Plaintiffs' expense.

144.     Nadra's acts in participating in the above-described scheme were intentional and in furtherance of the plan to defraud Plaintiffs.

145.     As a result, Plaintiffs have been damaged in an amount to be proved at trial and Defendants are jointly and severally liable for damages.

## SIXTH CAUSE OF ACTION
### (Concerted Action Liability against all Defendants by all Plaintiffs)

146.    Plaintiffs repeat the allegations of paragraphs 1 to 145 as if fully set forth here.

147.    Defendants agreed to engage in concerted action and a common plan and design to commit the wrongful and illegal acts described herein that would result in their enrichment.  The wrongful and illegal acts described herein were, in fact, committed by Defendants pursuant to their agreement.

148.    Upon information and belief, Nadra assisted Firtash in his plan to commit tortious acts against Plaintiffs in the form of the conduct described herein.

149.    Defendants acted tortuously against Plaintiffs in devising and furthering a scheme to defraud Plaintiffs of monies and the Plant.

150.    As a result, Plaintiffs have been damaged in an amount to be proved at trial and Defendants are jointly and severally liable for damages..

## SEVENTH CAUSE OF ACTION
### (Aiding and Abetting Liability against all Defendants by all Plaintiffs)

151.    Plaintiffs repeat the allegations of paragraphs 1 to 150 as if fully set forth here.

152.    Upon information and belief, Nadra had actual and complete knowledge of all of the wrongful and illegal activities of Firtash described herein, including, but not limited to, his fraud in the inducement to cause Plaintiffs to sign the Agreement, and Firtash's injurious

falsehoods vis a vis the Red Notices; and, in fact, Nadra knowingly participated in and provided substantial assistance in the commission of those activities and other conduct related thereto.

153.    At no time did Nadra attempt to stop such wrongful or illegal conduct or inform Plaintiffs about the illegal conduct of Firtash, but, in fact, encouraged and participated in such conduct for Firtash's and its own benefit.

154.    As a result, Plaintiffs have been damaged in an amount to be proved at trial and Defendants are jointly and severally liable for damages stemming from the fraud.

**WHEREFORE,** Ilya Segal, Vadim Segal, and Dancroft Holdings demand judgment against Defendants as follows:

1.    On the first cause of action, damages in an amount to be determined at trial, plus interest;

2.    On the second cause of action, actual and punitive damages in an amount to be determined at trial, plus interest;

3.    On the third cause of action, actual and punitive damages in an amount to be determined at trial, plus interest,

4.    On the fourth cause of action, actual and punitive damages in an amount to be determined at trial;

5.    On the fifth cause of action, actual and punitive damages in an amount to be determined at trial;

6.    On the sixth cause of action, actual and punitive damages in an amount to be determined at trial;

7.    On the seventh cause of action, actual and punitive damages in an amount

to be proved at trial;

8.    Awarding plaintiff its costs and disbursements, including its reasonable

attorneys' fees, in connection with this action; and

9.    Granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
      November 18, 2013

HODGSON RUSS LLP

By:_____
      Joseph P. Goldberg, Esq. (JG 1551)
      1540 Broadway, 24th Floor
      New York, New York 10036
      Tel: (212) 751-4300
      Fax: (212) 751-0928
      E-mail: jgoldberg@hodgsonruss.com
      *Attorney for Plaintiffs Ilya Segal, Vadim Segal*
      *and Dancroft Holdings*

To:
Kathleen M. Wood, Esq.
Robert Arnold de By, Esq.
Connon Wood Scheidemantle LLP
35 East Union Street, Suite C
CA, CA 91103
Tel:  (626) 638-1765
       (626) 638-1762
Fax:  (626) 792-9304
Email:  kwood@connonwood.com
           rdeby@connonwood.com

- 33 -